NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0597n.06

Nos. 16-1800/1969

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18, | ) ) ) | |
| Petitioner/Cross-Respondent, | ) ) ) | **FILED**<br>Oct 31, 2017<br>DEBORAH S. HUNT, Clerk |
| v. | ) ) | |
| NATIONAL LABOR RELATIONS BOARD, | ) ) | ON PETITION FOR REVIEW |
| Respondent/Cross-Petitioner, | ) ) ) | AND CROSS-PETITION FOR ENFORCEMENT FROM THE NATIONAL LABOR |
| CONSTRUCTION EMPLOYERS ASSOCIATION; DONLEY'S INC.; HUNT CONSTRUCTION, (now AECOM); PRECISION ENVIRONMENTAL COMPANY; CLEVELAND CEMENT CONTRACTORS, INC.; B & B WRECKING & EXCAVATING, INC., | ) ) ) ) ) ) ) | RELATIONS BOARD |
| Intervenors. | ) ) ) | |

Before: SUHRHEINRICH, GRIFFIN, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Two unions had contracts to do similar work for various construction companies. One of those unions—the International Union of Operating Engineers, Local 18—staged a strike, then threatened more strikes, and later filed grievances against companies that had given some of the work to members of the other union. The National Labor Relations Board eventually ordered Local 18 to stop trying to acquire work that way. Local 18 now petitions us to review that order, arguing that its members had a right to perform all the

work in dispute—even though, as its own representative said, Local 18 "gave away" that right "a long time ago." We deny Local 18's petition for review and grant the Board's cross-petition for enforcement.

## I.

## A.

Local 18 represents operators of construction equipment in Ohio and Northern Kentucky. The union has work agreements with two groups of construction companies: the Associated General Contractors (Contractors) and the Construction Employers Association (Employers). Both agreements require the companies in those groups to hire Local 18 members to work the forklifts and skid steers (vehicles with arms for lifting and carrying) at the companies' sites.

The Contractors and Employers have similar agreements, also covering forklift and skid-steer work, with Laborers' International Union of North America, Locals 894 and 310. For years, certain members of the Contractors and Employers—namely Donley's, Cleveland Cement Contractors, B & B Wrecking & Excavating, Hunt Construction, and Precision—have assigned the work mostly to Laborers, along with some other unions not involved here. They continued to do so at the sites at issue.

For example, Donley's hired Laborers members to drive the forklifts at a site in Akron. In early 2012, however, a Local 18 representative showed up at the site, saying that he wanted Local 18 members on the forklifts or else Local 18 was "going to shut this motherf***er down." He went on: "We're just trying to get back what we gave away a long time ago. You guys have been f***ing us for 30 years."

Soon thereafter Local 18 picketed the site. Two of its members—who were working the cranes—went on strike, closing the site for the day. Local 18 then sent Donley's a "pay-in-lieu"

grievance, demanding the money its members would have earned on the forklifts. The sides met to resolve the grievance; when that failed, Donley's warned Laborers that the forklift work might go to Local 18. Laborers responded that its own members would strike if that happened.

Meanwhile Local 18 filed more grievances against Donley's, Cleveland Cement, B & B, Hunt, and Precision for using Laborers members on the forklifts and skid steers at various sites. Local 18 also threatened another strike, this time against the Employers, which in turn warned Laborers that its members might lose some work. Laborers again threatened to strike if they did.

B.

Donley's filed charges against Local 18 and Laborers with the National Labor Relations Board, alleging that each union had used strikes or threats to obtain work for their members— both of which are "unfair labor practices" under section 8(b)(4)(D) of the National Labor Relations Act. *See* 29 U.S.C. § 158(b)(4)(D). The Employers and the other companies later filed similar charges against Local 18 and Laborers.

Before the Board could rule on those charges, however, section 10(k) of the Act required the Board to determine whether both unions had claims to the forklifts and skid steers—and, if so, who should get to drive them. *See* 29 U.S.C. § 160(k). The Board issued two awards under section 10(k). Both times it found that Laborers and Local 18 each had valid claims to the work; both times it awarded the work to Laborers, based largely on the companies' usual practices.

Local 18 did not withdraw its grievances, but instead filed more. The Board's General Counsel responded with a complaint against Local 18 alleging the same unfair practices that the companies had alleged, plus one more: that Local 18 had violated the Act by continuing to seek payment in lieu of work that the Board had already awarded to another union.

The Board found that Local 18 had violated section 8(b)(4)(D), and thus ordered Local 18 to stop striking, threatening to strike, and maintaining grievances against the companies. Local 18 now asks us to review that order, which the Board in turn asks us to enforce.

II.

We review the Board's order for substantial evidence, upholding the Board's conclusions if "a reasonable mind might accept the evidence as adequate to support" them. *Kellogg Co. v. NLRB*, 840 F.3d 322, 327 (6th Cir. 2016).

A.

Local 18 contests the Board's conclusion that Local 18 engaged in unfair labor practices. Section 8(b)(4)(D) prohibits unions from using strikes or threats to force an employer to assign work to their members rather than to members of another union. *See* 29 U.S.C. § 158(b)(4)(D). The Board interprets that section also to prohibit unions from maintaining pay-in-lieu grievances after the Board has awarded the work to another union, an interpretation that no party contests here and thus one that we assume (for purposes of this case) is correct. *See Int'l Ass'n of Machinists & Aerospace Workers Dist. Lodge 160*, 360 N.L.R.B. 520, 521-22 (2014). But the Board permits such tactics when a union seeks "merely to preserve the work it previously had performed." *Int'l Ass'n of Machinists & Aerospace Workers, Dist. 190*, 344 N.L.R.B. 1018, 1020 (2005).

According to Local 18, that is all Local 18 sought to do here. Whether a union seeks to preserve work depends on the scope of work its members have done in the past. If they have exclusively performed certain work, the Board permits their union to seek to preserve the work as theirs. *See Highway Truckdrivers & Helpers, Local 107*, 134 N.L.R.B. 1320, 1321-23 (1961).

If they have never done the work, their union has nothing to preserve. *See Laborers Int'l Union of N. Am., Local 265*, 360 N.L.R.B. 819, 822-23 (2014).

The analysis is the same when employers divide the same work between different unions, as the companies did here. The Board looks at the scope of the work that each union's members have performed: if one union seeks to expand its members' share of the work, then it seeks not merely to preserve work, but to acquire more. *See Chicago & Ne. Ill. Dist. Council of Carpenters*, 341 N.L.R.B. 543, 544-45 (2004). The question is thus whether Local 18 members had ever performed the scope of forklift and skid-steer work that their union sought to secure here.

The Board found—and Local 18 does not contest—that Donley's, Cleveland Cement, B & B, Hunt, and Precision had for years assigned most of their forklift and skid-steer work to members of Laborers. Donley's, Cleveland, B & B, and Precision have done so since the 1990s; Hunt has done so since joining the Employers. They all said as much in hearings before the Board, and we recognized as much in another case born from this dispute. *See Orrand v. Hunt Constr. Grp., Inc.*, 852 F.3d 592, 594 (6th Cir. 2017). Granted, Local 18 members did similar work for Precision on some occasions, and for different Employers companies (not involved here) on others. That gave Local 18 a claim to some forklift and skid-steer work under the agreements. Yet when Local 18 began striking, threatening strikes, and filing grievances, it was laying claim to more. A Local 18 representative said as much: the union wanted to "take back" what it "gave away," and to replace Laborers members in the process. But the record shows that, even if Local 18 members have done this sort of work under the agreements, they have never done it to the exclusion of other unions—and certainly not for the five companies involved here.

Thus, a reasonable mind could find that the evidence adequately supports the Board's conclusion that Local 18 was not trying to preserve work, but to acquire more.

Local 18 attacks that conclusion on three fronts, arguing first that the Board skipped a step in its analysis. According to Local 18, the Board should have begun by determining the "bargaining units," *i.e.*, the number of companies bound by the work agreements. If the Board considered Local 18's work for all the companies that had adopted those agreements and not just for the five involved here, Local 18 argues, the Board would have seen that Local 18's share of forklift and skid-steer work was actually quite large. But the Board did consider Local 18's work for all those companies; it simply concluded that the work did not matter. No matter how large the scope of that work was, it did not encompass the new work that Local 18 sought through its strikes, threats, and grievances. Thus, Local 18 did not use those tactics to preserve its members' existing work, but to add to it. *See Carpenters*, 341 N.L.R.B. at 545.

Local 18 argues next that, even if its members never did the disputed work, the work was "fairly claimable" under Board precedent. The Board has approved this theory in its decisions under sections 8(b)(4)(B) and 8(e), which are different provisions than the one Local 18 violated here; the Board has not applied this theory in decisions under section 8(b)(4)(D), the provision Local 18 did violate. And even in those other decisions, the Board has still looked to the scope of union work: where a company has a "practice" of assigning work to a union, that union has a fair claim to the work and so may seek to preserve it. *See Newspaper & Mail Deliverers' Union of N.Y. & Vicinity*, 298 N.L.R.B. 564, 566 (1990). If any union had such a claim here, however, it would be Laborers, not Local 18.

Local 18 also argues that the scope of union work is not in fact the ultimate question. Although the Board has said that it is, the Board has also noted that the "typical 8(b)(4)(D)

situation involves only a single employer." *Bhd. of Teamsters & Auto Truck Drivers Local No. 85*, 224 N.L.R.B. 801, 807 (1976). Based on that statement, Local 18 says that the rules change when many employers are involved. But it overlooks the next sentence of the decision it cites: "[T]he terms of the statute do not expressly limit 8(b)(4)(D) to cases where competing groups of employees are employed by the same employer and the Board has already heard and rejected this contention." *Id.* Local 18 does not challenge that interpretation here; and per that interpretation, unions may not use strikes, threats, and grievances to acquire work from one employer or many. Thus this argument fails.

B.

Local 18 argues finally that Laborers and the companies used unfair tactics of their own. To resolve a dispute under section 10(k), the Board first needs reason to believe that two unions have claims to the same work and that one of them has used an unfair labor practice to advance its claim. *See Int'l Union of Operating Eng'rs Local 150*, 345 N.L.R.B. 1137, 1139 (2005). Here, according to Local 18, the companies and Laborers colluded to manufacture these conditions. Their scheme, Local 18 asserts, was to sign an agreement for the work that belonged to Local 18; Laborers then threatened a strike so that the Board could hear the dispute, rule for Laborers, and thus enable the companies to avoid their obligations to Local 18. Given these "unclean hands," Local 18 argues, the Board should never have held the 10(k) hearings in the first place.

But the Board would have had a reason to hold those hearings even if Laborers and the companies had not (allegedly) contrived one. The Board knew that two unions had claims to the same work, given Local 18's repeated claims to that work and Laborers's history of actually doing it. And the Board had reason to believe that one of them (namely, Local 18) had used

strikes, threats, and grievances to acquire that work—as substantial evidence would later show. The Board's consideration of this dispute was therefore proper; as the Board concluded, Local 18 itself supplied reason enough for the 10(k) hearings. That conclusion in turn defeats Local 18's due-process argument, which derives from Local 18's collusion claims and thus fails with them.

\*     \*     \*

Local 18's petition for review is denied, and the Board's cross-petition for enforcement is granted.